UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE


JOSEPH B. THOMPSON          )
                                      )
v.                                  )          NO. 2:06-CV-134
                                      )          *Greer/Inman*
TONY PARKER, Warden         )


## MEMORANDUM OPINION


       This *pro se* application for a federal writ of habeas corpus, 28 U.S.C. §

2254, was transferred to this Court from the Western District of Tennessee. [Doc. 1].

Thereafter, respondent filed an answer; petitioner a response to the answer and a

corrected application; respondent an answer to the corrected application; and

petitioner a response to that answer as well. [Docs. 10, 12, 15, 19 and 20].

Respondent has also submitted copies of the state court record. [Docs. 11, 29;

Addenda 1-29]. Thus, the case is ripe for disposition.

## I. Procedural Background

       In 2001, a jury in the Criminal Court of Sullivan County, Tennessee

convicted Joseph B. Thompson of aggravated robbery and aggravated kidnapping.

The trial court imposed an effective prison sentence of forty years—twenty-years for

the first offense and a consecutive twenty years for the second. Petitioner appealed

and his judgments were affirmed. *State v. Thompson*, No. E2002-00061-CCA-R3-CD, 2003 WL 1202979 (Tenn. Crim. App. Mar. 17, 2003), *perm. to app. den.* (Tenn. 2003). He also sought post-conviction relief, but was unsuccessful. *Thompson v. State*, No. E2004-00920-CCA-R3-PC, 2005 WL 2546913 (Tenn. Crim. App. Oct. 12, 2004), *perm to app. den*. (Tenn. 2006). Likewise unsuccessful were his state habeas corpus petitions. *Thompson v. Parker*, No. W2005-01463-CCA-R3-HC, 2005 WL 3533321 (Tenn. Crim. App. Dec. 22, 2005); *Thompson v. Parker*, No. W2008-02399-CCA-R3-HC, 2009 WL 4723404 (Tenn. Crim. App. Dec. 9, 2009). This federal petition was filed between his first and second state court habeas corpus petitions.

## II. Factual Background

The following factual recounting is taken from the state appellate court's opinion on direct review. *See Thompson*, 2003 WL 1202979 419082, at *1 - *4.

During the early morning hours of June 20, 1999, the sixty-two-year-old victim, Shirley Huffman, a desk clerk at the Microtel motel in Kingsport, was attacked and beaten by a man wearing a ski mask. The victim, who suffered injuries to her head and face, felt the sensation of being dragged before she lost consciousness. When she briefly regained consciousness, she realized that she was in the restroom adjacent to the manager's office.

Robin Lynette Blix, also a desk clerk at the motel, testified that the defendant, whom she recognized as an acquaintance of her ex-boyfriend, entered the lobby of the motel through the front door just before midnight. According to Ms. Blix, the defendant left the lobby before the victim, who began her shift at midnight, arrived for work. She recalled that the victim had locked all of the motel's exterior doors shortly after

her arrival. Ms. Blix remembered that the defendant had been a guest at the Microtel several days earlier, but was not registered on the night of the robbery.

Alicia Hendrickson, general manager of the Microtel, explained that key cards issued to guests were programmed to open both the individual guest rooms and the exterior doors. She explained that each key card could be used until a new key was created with the same room number. Ms. Hendrickson, who attended the same high school as the defendant, recalled that he was a guest at the motel from June 5 through June 12, and still owed more than $200 for his lodging. She testified that when the defendant checked into the motel on June 5, he paid for one day and made arrangements to pay for the balance of his stay when he received his paycheck. Ms. Hendrickson explained that she had made a similar arrangement with the defendant on an earlier occasion and that he had paid the full balance. After being notified of the robbery, Ms. Hendrickson went to the motel and gave the defendant's name to police based upon the description of the perpetrator provided by other witnesses. Ms. Hendrickson testified that more than $400 was missing after the robbery.

Robert Wayne Hughes, who was training as a reserve deputy for the Sullivan County Sheriff's Department at the time of the offenses, testified that he and his girlfriend, Suzanne Faye Lawson, arrived in separate cars at the Microtel between 1:00 and 1:30 a.m. As Hughes drove closer to the entrance of the motel, he saw a masked black male, who was wearing dark brown clothing, lurking in a hallway near the lobby. According to Hughes, the individual retreated into the hallway after seeing him outside. Hughes then directed Ms. Lawson to follow him to an adjacent parking lot so that they could not be seen from the lobby. Afterward, Hughes drove back toward the lobby and walked to the call box to summon an attendant. After the victim allowed him into the lobby, Hughes checked the hallway near the lobby to see if anyone was there. He stated that when he informed the victim that he had seen a man lurking near the lobby, she did not seem concerned, apparently believing that the individual was a registered guest.

Suzanne Faye Lawson, Hughes' girlfriend, testified that she observed an individual, whom she later identified as the defendant, drive a car from the rear parking lot of the motel, park, and then walk toward her vehicle. Ms. Lawson stated that she saw the defendant's face as he walked within ten feet of her car. She described the defendant as wearing dark gray clothing and having black hair, a medium complexion, and a slim build. Later, she saw the defendant enter a back door of the motel. Ms. Lawson remembered that when she informed Hughes that she had seen the defendant enter through the back door, Hughes checked the floors and then called the front desk to tell the clerk of the defendant's presence. After the robbery, Ms. Lawson identified the defendant from a photographic lineup as the individual she had seen enter the motel.

James Alexander Bardinelli and Joel Dingus, employees of a Kroger located adjacent to the Microtel, were standing outside their place of business sometime between 2:00 and 2:15 a.m. They were approached by the defendant, who offered to sell them some sporting tickets. Bardinelli, who identified the defendant from a photographic lineup, recalled that he and his brother had seen the defendant the day before. Dingus saw the defendant drive into the parking lot of the Microtel and enter through a back door.

At 2:39 a.m., Sergeant Dan Brookshire and Officer Mark Osterman of the Kingsport Police Department responded to the silent alarm at the Microtel. Upon their arrival, the front door was locked and there was no clerk located in the desk area. After someone inside opened the door, Officer Osterman examined the front desk area while Sergeant Brookshire stayed in the lobby. Sergeant Brookshire observed a screwdriver stuck in the doorjamb of the restroom located adjacent to the front desk. Officer Osterman, who had seen a large amount of blood on the floor behind the front desk and on the restroom door, was unable to open the restroom door because the screwdriver had been lodged between the door and the frame. When the screwdriver was removed, the officers discovered that the door was locked. After gaining entry by the use of a knife, officers discovered the victim, who was badly injured and lying in a pool of blood.

Detective Penny Kindle of the Kingsport Police Department testified that she interviewed the victim at Wellmont Hospital on the day following the crimes. She took several photographs which depicted the various injuries the victim had suffered during the attack. After the defendant's arrest, Detective Kindle noticed that defendant's right hand was swollen.

Mary Kay Arnold, who was dating the defendant at the time of the offenses, testified that the defendant was at her residence until 10:00 p.m. on the day before the robbery. She recalled that he was wearing blue jeans and a red tee shirt when he left. According to Ms. Arnold, the defendant returned shortly after 3:00 a.m. the following morning. Awakened by the sound of running water in her kitchen sink, she walked downstairs and heard the defendant say, "Do not come into the kitchen." According to Ms. Arnold, the defendant was wearing the same clothing he had on earlier in the evening. She noticed that his right hand was swollen. She testified that the defendant then left the residence and, when he returned shortly after sunrise, he was wearing a yellow shirt, yellow hat, and blue jeans and was carrying a Proffitt's bag. The defendant handed her a pair of brown suede boots and asked her to discard them. According to Ms. Arnold, the boots had dark red or brown stains on the toe area. She recalled that the defendant asked her to drive to the Laundromat, where he dumped clothing from a black plastic bag into a washing machine. Ms. Arnold testified that she did not see the clothing that had been in the bag and conceded that she had originally lied to the police regarding the defendant's whereabouts on the night of the offenses. She explained that she "was scared because [she] had thrown away some boots and my friend told me that he might have been the one."

Officer David Quillen testified that the defendant asked to speak with him on the day after the robbery. According to Officer Quillen, the defendant initially denied any involvement, claiming that he had been living in his car and was asleep at the time. Eventually, the defendant acknowledged that he had been at the Microtel prior to the robbery. When Officer Quillen noticed that the defendant's right hand was badly swollen, the defendant explained that he had hit someone but refused to identify the individual. The officer stated that the defendant at first

denied committing the robbery but later qualified his claim, pointing out that "no person saw [him] commit any crime."

Dr. Joann D'Aprile Lukes, who treated the victim, testified that there was a three-centimeter laceration on the victim's left eyebrow, a five-centimeter laceration on her left ear, a one-centimeter scalp laceration, and a one-centimeter laceration on her left middle finger. She described the victim as having extensive swelling on the right side of her face. Her right eye was swollen shut, her lips were swollen, and her entire facial area was black and blue.

Dr. Timothy A. Urbin, a neuropsychologist, observed severe injuries to both sides of the front part of the victim's brain and lesser injuries to the right side of the back part of her brain. He diagnosed the victim with a concussion and Post-Traumatic Stress Disorder. It was his opinion that the victim would experience difficulties with her thought processes for the remainder of her life.

The victim, sixty-five-year-old Shirley Huffman, recalled that just prior to the attack, a guest warned her that he had seen a man lurking in the lobby. As a result, she removed $200 from the cash drawer behind the front desk and placed it in the safe. Later, just after the same guest telephoned the front desk to tell her that he had seen someone on the second floor of the motel, a light-skinned black male appeared in the lobby, jumped over the counter, and began to beat her with his right fist, eventually threatening to shoot her. The victim testified that she struggled to reach the alarm button but was not sure if it was activated because she eventually lost consciousness. She recalled that when she regained consciousness, she realized that she was on the floor of the restroom and was able to lock the door from the inside. The victim was unable to identify the defendant's face because he wore a ski mask during the attack, but otherwise described him as only slightly taller than her.

Karen N. Lanning, an agent with the FBI, testified for the defense. Ms. Lanning, an expert in the field of fiber and hair analysis, stated that she had examined a number of hairs collected from inside the defendant's vehicle and determined that none of them belonged to the victim. She also examined hairs found on the victim and concluded that they were

not those of the defendant. Ms. Lanning stated that if the perpetrator were wearing a mask, gloves, a long-sleeve shirt, pants, and boots, she would not expect to find his hair at the crime scene.

Three forensic scientists with the TBI testified for the defense. Hoyt Phillips testified that he compared two latent fingerprints and one palm print found at the scene with the known prints of the defendant and determined that the prints found at the scene were not those of the defendant. Joe Minor testified that he examined the accelerator pedal and brake pedal from the defendant's car and concluded that there was no blood on either. He also found no blood on the floor mats from the defendant's car. Minor stated that no blood was found on the six pairs of the defendant's shoes that were tested. Linda Littlejohn compared the defendant's shoes with impressions left at the scene and determined that none of the shoes tested matched the impression.

*State v. Thompson*, 2003 WL 1202979,*1 -* 4 (Tenn.Crim.App. 2003).

### III. Standards of Review

A. Exhaustion/Procedural Default

A state prisoner who petitions for habeas corpus relief must first exhaust his available state court remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. 28 U.S.C § 2254(b)(1). If a claim has not been presented to the state courts, but a state court remedy is no longer available (i.e., when an applicable statute of limitations bars a claim), then the claim is deemed to have been procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991); *Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004). If a claim has been presented to state courts, but those courts reject it on the basis that it has not been raised in

compliance with a state procedural rule, it too has been procedurally defaulted. *See, e.g., Murray v. Carrier*, 477 U.S. 478 (1986).

In either scenario, the procedural default forecloses federal habeas corpus review, unless a petitioner shows "cause" to excuse his failure to fairly present the claim and "actual prejudice" stemming from the constitutional violation. *Coleman*, 501 U.S. at 732; *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977). Alternatively, he may show that a failure to review the claim will result in a miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995). However, the latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Id.* at 323.

B.  Adjudicated Claims

Decisions of the state courts are reviewed pursuant to 28 U.S.C. § 2254(d), which limits a federal district court's jurisdiction to examine habeas claims on the merits. For example, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28

U.S.C. § 2254(d)(1) and (2). A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts that cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

An "unreasonable application" of federal law under § 2254(d)(1) occurs when the state court decision correctly identifies the governing legal rule in Supreme Court cases but unreasonably applies or unreasonably refuses to extend that principle to the particular facts of the case. *Id.* at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000). The habeas court is to determine <u>only</u> whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Williams*, 529 U.S. at 411.

In addition, state-court factual findings are to be presumed correct unless a petitioner offers clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). That presumption also applies to credibility findings made by state courts. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. den.*, 520 U.S. 1257 (1997), *overruled on other grounds* by *In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated* by *Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989). "[D]eference does not imply abandonment

or abdication of judicial review," *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003); still, the "highly deferential standard" dictated in § 2254(d) mandates that state courts' decisions "be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455 (2005) (citations omitted). Given two permissible views of the evidence, a fact finder's choice between them cannot be clearly erroneous. *Amadeo v. Zant,* 486 U.S. 214, 226 (1988).

The Court now examines the claims offered in the section 2254 petition under the above standards. To facilitate discussion, claims have been combined and renumbered.

## IV.  The Claims

1.    ***Brady* Violation**

In his first claim, petitioner contends that the State failed to secure information from a witness who identified someone other than him as the perpetrator of the offenses, that he was unable to locate the witness for trial, and (impliedly) that the testimony of the officer as to the missing witness's statement was improperly excluded at trial. Respondent argues that the state court's decision on the claim must remain undisturbed because it is not contrary to the well established federal law and because the state court did not unreasonably apply *Brady* in disposing of the claim.

Petitioner insists, in his response [Doc. 20] that the delay in turning this evidence over to the defense prejudiced his ability to have this evidence for trial and resulted in the evidence "being forever loss (sic)." Petitioner also insists that the exclusion of the officer's testimony was an abuse of discretion because the state court knew the weakness of the prosecution's case and that the inclusion of the evidence would almost surely mean an acquittal for petitioner. *[Id.*].

On appeal, petitioner claimed that the prosecution did not disclose, in a timely manner, information that Officer Osterman had observed three or four white males standing in the lobby area of the Microtel Motel after the robbery and had overheard one of the bystanders remark that he had seen a black male in the parking lot, that the only black male he knew was "Jo-Jo," and that "it wasn't Jo-Jo."[1] Petitioner also challenged the trial court's exclusion of the officer's testimony concerning that remark. The Tennessee Court of Criminal Appeals rejected both claims—the first one, on the basis that the questioned evidence was ultimately disclosed and, thus, did not fall within the ambit of *Brady*, and the second one based on the lack of prejudice to the defense resulting from the tardy disclosure of information.

---

[1] Petitioner "apparently was referred to as Jo-Jo." *See Thompson*, 2003 WL 1202979, *104. [Addendum 4, vol. I at 74].

In reviewing the claim, the state court identified the rule established in *Brady v. Maryland,* 373 U.S. 83 (1963), as supplying the relevant legal principle in Supreme Court cases. The state appellate court found the facts which follow to be relevant to the disposition of the claim.

> Officer Osterman, who arrived at the Microtel shortly after Sergeant Brookshire, testified that it was his duty to make sure that no one entered the crime scene while the police were conducting the investigation. He stated that he otherwise took no significant part in the actual investigation of the case. While standing near the lobby area of the motel, Officer Osterman noticed four white males standing near the hallway. He heard one of the men say "the only black man I know is 'Jo-Jo' and it wasn't 'Jo-Jo.'" At the time Officer Osterman heard the statement, he had not been informed that the defendant was a suspect. Some twenty months later, Officer Osterman, during an interview by the assistant district attorney, for the first time recalled his knowledge of the conversation. The state immediately informed the defendant of the statement and the trial court granted a six-month continuance so that the defendant could investigate its origin.

*Thompson*, 2003 WL 1202979, *10.

Reasoning that the challenged information was not truly *Brady* material because *Brady* applies to a complete failure to disclose, whereas in petitioner's case, the evidence *was* disclosed, albeit belatedly, and that petitioner had not shown that he was prejudiced by the delayed disclosure, the state appellate court denied relief. It also denied relief on petitioner's related challenge to the exclusion of testimony by the officer who had overheard the comment that "it wasn't Jo-Jo."

As the state court observed, the starting point for review of a constitutional due process claim involving the non-disclosure of evidence is *Brady v. Maryland*. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Evidence is material only where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

The *Brady* rule, generally, does not apply where previously undisclosed evidence is handed over at trial, and not actually suppressed, *United States v. Word*, 806 F.2d 658, 665 (6th Cir.1986), unless the delay prejudices a defendant. *United States v. Davis*, 306 F.3d 398, 420-21(6th Cir. 2002), *cert. den.*, 537 U.S. 1208 (2003). *See also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (describing the elements of a *Brady* claim as: 1) existence of exculpatory or impeaching evidence favorable to the accused; 2) suppression of the evidence by the prosecution; and 3) ensuing prejudice to the defense).

In this case, the trial court granted an extended continuance to permit the defense to locate the witness who purportedly made the it-was-not-Jo-Jo statement. The state court observed that while the defense's efforts to find the witness were fruitless, that result was not due to the delayed disclosure of the statement. This was so because the only description the officer could provide of that individual was that he was a white male and because the broadness of that description made it improbable that a timely disclosure would have led to the location of the absent witness. The Court of Criminal Appeals rejected this claim.

With respect to the trial court's alleged incorrect exclusion of evidence, the Tennessee Court of Criminal Appeals, applying state rules of evidence, found that hearsay, generally, is inadmissible, that a comment by some unknown person that petitioner, also known as "Jo-Jo," was not in the Microtel lobby when the crime occurred qualified as hearsay, and that there had been no showing of the existence of an exception to the hearsay rule. This ancillary claim was likewise rejected.

The state court which reviewed these issues did not unreasonably apply *Brady* to the facts of petitioner's case in deciding that, in the absence of a showing of prejudice flowing from the delay in disclosure, there was no due process violation. Furthermore, a state court's rulings on the admission of evidence are only cognizable as habeas corpus claims if they violate a defendant's due process right

to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991); *Patterson v. New York*, 432 U.S. 197, 202 (1977) (To rise to the level of a due process violation, a state-court evidentiary ruling must "offend . . . some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental.").

As the trial court observed in ruling on the alleged *Brady* violation, the motel where the robbery was committed was in a well-traveled area where people of all races come and go, so that evidence that a black man was seen in the parking lot close to the Microtel entrance about the time of the robbery would not have excluded petitioner as the perpetrator of the crimes. The Court sees no violation of due process by the exclusion of the officer's testimony because it did not result in fundamental unfairness. *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) ("Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial.").

2.      **Unconstitutional Search and Seizure**

The factual allegations which underlie petitioner's Fourth Amendment claim of an illegal search and seizure revolve around the seizure of a box of papers from petitioner's car. It is petitioner's contention that those papers were not connected to the crime nor described in the search warrant and that it, therefore, was

illegal to use this as evidence to tie him to the crime scene. The connection was made, he claims, by comparing signatures on a receipt found at the crime scene to a signature found on another receipt contained in the box.

Respondent acknowledges that petitioner did contest the admission of a receipt supposedly signed by petitioner as not properly authenticated, but also insists that he did not attack it on Fourth Amendment grounds or in a pretrial motion to suppress, as required by state procedural rules. Petitioner's failure to raise the habeas claim first in the state courts in the manner prescribed by state law and also as a federal constitutional claim, according to respondent, amounts to a procedural default. Petitioner does not directly respond to the procedural default argument, but instead suggests that he was forced into trial without a hearing to determine whether the illegal evidence should have been suppressed. Both parties' arguments miss the mark.

In *Stone v. Powell*, 428 U.S. 465 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id*. at 494. In other words, a habeas petitioner may not seek to raise issues challenging the legality of a search and seizure, if he had a full and

fair opportunity to raise the claims in state court and if the presentation of the claims was not frustrated by any failure of the state's corrective processes. *Id.* at 494-95.

A review of the record makes it clear that petitioner was given a chance to fully and fairly litigate his Fourth Amendment claims in the Tennessee courts. The transcript of the trial shows that petitioner passed on the opportunity to object to the admission of the receipt discovered in the vehicle search. [Addendum No. 4 at 700].[2]

As to the receipt from the crime scene, counsel filed a motion *in limini* to exclude it, but the motion was denied. [*Id.* at 46-48]. Counsel persisted in his suppression efforts, by arguing vigorously, during a jury-out discussion at trial, that the second receipt was inadmissible since it was highly prejudicial and had not been shown to belong to petitioner and since there were defects involving the the chain of custody and the authentication of the signature. [*Id.* at 965-78].

The trial court was not receptive to those arguments, ruling that they involved the weight of the evidence, not its admissibility, that those subjects were

---

[2] It also shows that during a motions hearing, defense counsel indicated that he intended to show at trial that, even though the crime scene was bloody, the officers who conducted the vehicle search located no blood evidence linking petitioner to the crime. This prompted the trial court to remind counsel that he could not use evidence from the search to benefit his client, while at the same time, seeking to suppress evidence from the search which the State might want to use. [Addendum No. 6 at 42-45].

proper ones for cross-examination, but not for a suppression hearing, and that the receipt would be admitted, though appropriate instructions on circumstantial evidence would be given. [*Id.*] Petitioner also challenged the introduction of the second receipt on appeal, albeit on state evidentiary grounds. [Addendum No. 7, at 24].

The Court concludes that petitioner had a full and fair opportunity to raise any of his Fourth Amendment concerns about the evidence, including the receipts, during those state criminal proceedings. Thus, under the *Stone* doctrine, those matters are unreviewable in this federal habeas corpus matter.

3.    **Double Jeopardy**

In this claim, petitioner alleges that his conviction was obtained in violation of the protection against double jeopardy, in that "the testimony provided to prove Aggervated (sic) Kidnapping was false and facts of force confinement" and that "[t]he jury was not informed the police officers testimony was false and incorrect at trial." [Doc. 15, Amd. Pet. at ¶13(C)]. The Court understands petitioner to be asserting essentially the same claim he raised in his direct appeal, i.e., "that his convictions for both aggravated robbery and aggravated kidnapping violate the rule established in *State v. Anthony*," with an additional argument derived, perhaps, from a post-conviction claim of ineffective assistance.

In *State v. Anthony,* 817 S.W.2d 299 (Tenn. 1991), and its progeny, the Tennessee Supreme Court held that, under certain circumstances, the confinement of a victim during some crimes (typically, robbery and rape) may support a separate conviction for kidnapping without violating due process. First, the restraint must go beyond that necessary to commit the accompanying felony. Second, the confinement must prevent the victim from summoning help; lessen the defendant's risk of detection; or create a significant danger or increase the victim's risk of harm. *Id.*; *State v. Dixon*, 957 S.W. 2d 532, 534-35 (Tenn. 1997) (clarifying *Anthony*).

In resolving this issue, the Court of Criminal Appeals recounted that the victim had testified that she had been beaten and then dragged into the restroom. She stated that she did not remember how the restroom door got closed, but recalled that she had locked the door from inside to protect herself. Other proof established that the victim had severe injuries and had drifted in and out of consciousness while in the restroom. The state appellate court observed that one officer had testified that he had to remove a screwdriver which had been inserted into the doorjamb to get into the restroom, finding it implicit in that testimony that the door could not have been opened as long as the screwdriver remained in place. Concluding that jamming the screwdriver in the doorjamb "prevented the victim from seeking help, increased her risk of harm, and reduced the defendant's risk of detection," the intermediate

state court found the evidence sufficient to support convictions for both aggravated robbery and aggravated kidnapping.

Petitioner maintains that, contrary to the state appellate court's finding on direct appeal and the officer's implied testimony, the victim's restraint in the Microtel restroom was not beyond that necessary to commit the aggravated robbery because placing the screwdriver in the doorjamb did not hinder her escape. Petitioner's position, presumably, rests on an experiment performed by his post-conviction attorney, which purportedly showed that it was possible to open the restroom door with the screwdriver rammed in the doorjamb.

The screwdriver issue was presented to the post-conviction court to illustrate that petitioner's trial counsel gave his client ineffective assistance. The error alleged was that counsel had failed to perform a test to determine if a screwdriver placed in the Microtel restroom door actually would have prevented the victim from leaving that room. The state court found that the robbery took place at the Microtel's check-in-counter, not the restroom, and that (by inference) the victim's confinement was beyond that necessary to commit the robbery. The screwdriver test, according to the post-conviction court, was not an true re-creation of the crime scene because there was no proof as to the condition of the screwdriver on the night of the robbery.

Furthermore, the state court noted that the individuals who conducted the test in anticipation of offering proof at the post-conviction hearing appeared to be healthy men, not a person of elderly years, like the victim, who had been beaten senseless before being placed in the motel restroom. The victim's condition was so dire that the officers who arrived at the scene thought she was dead. For a person in the victim's condition, even to open a closed door would have been impossible or, at the very least, an ordeal, so the state court found.

The post-conviction court ruled that, regardless of whether the screwdriver would have prevented the victim's escape from the bathroom, being put in the restroom placed her in much greater danger. And during the post-conviction appeal, the higher state court iterated that the "proof at trial was that the bathroom door was locked form (sic) the inside and not that the screwdriver alone locked the door." *Thompson*, 2005 WL 2546913, at *24.

At the outset, it is noteworthy that the *Anthony* court did not employ a constitutional double jeopardy analysis to dispose of the claim, stating that "there is no question that the offenses of robbery and kidnapping have separate elements and that dual convictions, even for conduct arising from the same criminal episode, would not violate double jeopardy provisions." *Anthony*, 817 S.W.2d at 300-301 (Tenn. 1991). Instead, the opinion rested squarely on the principles of due process

contained in the Tennessee Constitution. *Id.* at 306. Secondly, whether the rule in *Anthony* was violated is a state law concern, and not a recognizable federal habeas corpus claim. *See, e.g., Johnson v. Coyle,* 200 F.3d 987, 995 (6th Cir. 2000) ("At least one Ohio court has held that the physical restraint incident to rape may constitute the restraint of liberty required for kidnapping . . . however, that is a matter for the Ohio courts.") (internal citation and footnote omitted). As the Supreme Court has often found, state courts are the final arbiters of state law. *See Lewis v. Jeffers,* 497 U.S. 764, 780 (1990); *see also Estelle,* 502 U.S. at 67 ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.").

Third, to the extent that a federal claim is lurking in the shadows of petitioner's allegations, he will be entitled to habeas corpus relief if the state court's adjudication of his claim was contrary to or an unreasonable application of the relevant rule contained in a Supreme Court decision. Petitioner has not pointed to a Supreme Court case which establishes the rule he now urges upon this Court. Accordingly, petitioner cannot be granted the writ.

4. **<u>Unconstitutional Sentencing</u>**

Petitioner asserts that Tennessee's Criminal Sentencing Act was unconstitutional in that it violated his Sixth Amendment right to a jury trial because it allowed the trial court to sentence petitioner above the minimum term of twelve years. Respondent argues that this issue, presumably based upon the Supreme Court's ruling in *Blakely v. Washington*, 542 U.S. 296 (2004),[3] was raised in petitioner's state habeas corpus proceedings, but was dismissed, *inter alia*, because the issue was not recognizable in such proceedings.

In Tennessee, the only defects permitted to be raised in a state habeas corpus petition are those which would render the judgment void, not merely voidable. *State v. Archer*, 851 S.W.2d 157 (Tenn. 1993). The state appellate court found that, because the purported flaw in petitioner's case was the latter type of defect, the claim was not cognizable in that type of proceeding. It further found that *Blakely* did not apply retrospectively to petitioner's case.[4]

---

[3]     *Blakely*'s predecessor case, *Apprendi v. New Jersey*, 530 U.S. 466 (2000), held that, with the exception of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be found by a jury beyond a reasonable doubt. *Id.* at 490. In *Blakely*, the Supreme Court applied *Apprendi* to Washington state's sentencing law.

[4]     Petitioner's sentence became final in 2003; *Blakely* was decided the following year. The state court also ruled that *Blakely* did not apply to the state's sentencing structure, but that is no longer good law. *See State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005), *vacated and remanded*, *Gomez v. Tennessee*, 127 S. Ct. 1209 (2007), *on remand*, *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007).

Because petitioner has failed to cite to Supreme Court precedent showing that *Blakely* is a new rule which is to be applied retroactively to cases on collateral review, he is not eligible for habeas corpus relief. Indeed, the Supreme Court expressly has declined to decide whether *Blakely* announced a new rule, and if so, whether it applies retroactively to collateral review cases. *Burton v. Stewart*, 549 U.S. 147, 149 (2007) (per curiam). *See Vieux v. Pepe*, 184 F.3d 59, 63 (1st Cir.1999) ("If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be 'contrary.'").

5.    **Allocution**[5]

        In this claim, petitioner alleges that he was denied an opportunity to speak at his sentencing, in violation of the Sixth Amendment. When he submitted this claim for disposition during his post-conviction case, the Tennessee Court of Criminal Appeals held that petitioner had waived it by failing to present it on direct appeal. *Thompson*, 2005 WL 2546913, at *15. As noted, a procedural default

_____

        [5]    Allocution has been defined "as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." *State v. Stephenson,* 878 S.W.2d 530, 551 (Tenn. 1994) (citing BLACK'S LAW DICTIONARY 76 (6th ed. 1990)) (footnote omitted). The Court has broadly construed petitioner's *pro se* pleading as raising the allocution issue as an independent claim and also as an illustration of ineffective assistance of counsel.

occurs when a prisoner actually presents his federal claim to the state courts but those courts decline to address it due to the prisoner's failure to meet a state procedural requirement. *See Murray v. Carrier*, 477 U.S. 478 (1986) (failure to raise claim on appeal); *Reed v. Ross,* 468 U.S. 1 (1984) (same). No cause and prejudice has been demonstrated and petitioner's unexcused procedural default has rendered federal review unavailable for this claim.

6. **Ineffective Assistance of Counsel**

Petitioner charges that, in various instances, his attorney gave him ineffective assistance at trial and on appeal. Respondent argues that any claims not properly offered first to the state courts have been procedurally defaulted and that any claims properly preserved for federal habeas corpus review will not entitle petitioner to relief because the state courts' resolution of those claims was not contrary to or an unreasonable application of clearly established federal law. The Court has reorganized petitioner's contentions into two categories: claims against trial counsel and claims against appellate counsel.

a) ***Trial Counsel Claims***

(i) *Advice on Suppression of Evidence*: Petitioner asserts that he was misadvised by his lawyer that success on a motion to suppress unfavorable evidence (the receipt) found during a vehicle search, if successful,

would also result in the exclusion of exculpatory evidence (lack of blood evidence) uncovered during that same search. When the claim was offered on appeal, the Court of Criminal Appeals found that proof was presented showing that counsel and his client discussed, several times, whether to seek to suppress the evidence obtained in the vehicle search as having been seized illegally, but that both concluded that it would be unwise to move to suppress all the evidence found in that search since no blood evidence had been found and since the lack of blood evidence would be favorable to petitioner.

Indeed, the lack-of-forensic-evidence-in-the-car argument played a significant role in petitioner's defense, so stated the Court of Criminal Appeals. The state court then determined that counsel's decision was tactical and was not subject to attack merely because a different strategy might have produced a different result. It ultimately concluded that petitioner has not proven that his attorney was ineffective for the alleged error or that he had prejudiced his client's defense.

Moreover, according to the state court, neither counsel nor petitioner was concerned about the receipt because it seemed irrelevant, until later-occurring events showed otherwise. Their concern had been with other items discovered in the car and counsel had moved to suppress these things. Indeed, part of the defense's plan was to demonstrate that many items in the car were innocuous, including the

receipt. All this changed when the prosecution used the receipt from the car to connect petitioner to the Microtel robbery by showing that a similar receipt was found at the crime scene. Evaluating counsel's performance at the time of the alleged error and declining to apply hindsight, the state court did not find any ineffectiveness with respect to the suppression of the receipt found in the car search.

(ii) *Jury Instruction*: Petitioner charges that counsel failed to object to the trial court's instruction, prior to deliberations, regarding the amount of fine to be imposed, thereby rendering ineffective assistance. Petitioner offered this claim to the post-conviction court, which cited to state law providing that any fine in excess of fifty dollars was required to be set by a jury absent a defendant's voluntary agreement to the contrary and that petitioner's offenses of conviction exceeded that amount. The Court of Criminal Appeals agreed with the trial court that the instruction was proper and that counsel had not given ineffective assistance by failing to object. It further found that, even if this had been a shortcoming on the part of counsel, it had not resulted in prejudice.

(iii) *Allocution*: Though not expressly raised in the federal petition, the Court has generously construed petitioner as claiming, as he did in state court, that counsel gave him ineffective assistance by failing to object when the state court disregarded his right to allocation prior to imposition of his sentence. It was

petitioner's argument that only after sentencing did he learn of his right to speak during sentencing and that, had he known of his right and exercised it, he might have been able to convince the trial court not to impose the maximum penalty. This might have been accomplished, petitioner surmised, by explaining to the trial court that the screwdriver could not have prevented the victim from leaving the motel restroom and that the case against him was weak and filled with error.

In addressing these allegations, the state court recounted that the evidence showed that, before sentencing, petitioner's attorney asked him if he wanted to testify or make a statement and that, after sentencing, petitioner mentioned that the trial judge did not ask him whether he wished to speak. It was petitioner's suggestion that the trial court's omission gave him a ground for appeal. To this, counsel replied that petitioner had had every right to speak during sentencing, but had chosen not to exercise that right. Even so, petitioner testified that he asked his attorney to raise the issue in the motion for a new trial, but that this issue was not included in the new-trial motion or on direct appeal. After summarizing the proof petitioner offered to support the claim, the state court concluded that petitioner had not demonstrated ineffective assistance.

b)    ***Appellate Counsel***

(i)    *Breach of Contract*:    Petitioner asserts that counsel breached a written contract which obligated him to raise legitimate issues for appeal. In state court, petitioner claimed,  and so testified, that under the terms of the contract, his attorney was required to file, along with his own appellate brief, a supplemental brief drafted by petitioner, containing issues not raised in counsel's appellate brief; that petitioner's mother delivered petitioner's supplemental brief to counsel; that counsel failed to file his client's brief at the same time he filed the brief he had prepared, even though the issues offered in the supplemental brief might have justified relief; and that, adding insult to injury, petitioner's request to file the supplemental brief *pro se* with the state appellate court was denied because he was represented by counsel.  Moreover, counsel failed to give petitioner a copy of the attorney-prepared brief before it was filed.

(ii)    *Withdrawal & The Rule 39 Motion*:    In closely-related claims, petitioner asserts that counsel failed to withdraw from the representation, despite the fact that a conflict of interest had arisen and despite petitioner's filing a civil law suit against counsel and having it served on him before petitioner submitted his *pro se* brief to the Court of Criminal Appeals and before the state appellate court issued its opinion in petitioner's criminal case.  As a result of counsel's failing,

petitioner was unable to file the *pro se* brief, presenting unraised constitutional errors on the part of the trial court and the prosecution. As a further result of counsel's failure timely to withdraw, petitioner was also denied his right to file a Rule 39(b) motion to rehear with the state appellate court.

The Court of Criminal Appeals noted, with respect to the above-cited attorney failings, that petitioner had filed numerous motions attempting to have his attorney removed from his case because counsel had refused to include, in the brief which counsel was preparing, all issues contained in petitioner's *pro se* supplemental brief. The state court had determined, however, that there was no cause for removing counsel from the case, even though petitioner thought that, if his attorney withdrew, he (petitioner) could file his *pro se* supplemental brief. Counsel stated during the post-conviction hearing that he reviewed the *pro se* brief for meritorious issues, but found none, and that he also determined that his brief addressed all the issues appropriate for appeal. Twelve days after oral argument, petitioner's attorney learned that his client had brought a civil action against him, and he moved to withdraw from the case.

Pointing to the post-conviction court's opinion that it would be rank speculation to hold that filing a Rule 39 motion provided no benefit to petitioner, the Court of Criminal Appeals ultimately concluded that petitioner had shown neither

deficient performance nor prejudice and, thus, was entitled to no relief on his claims of ineffective assistance.

The two-prong legal rule governing a claim of ineffective assistance is found in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 390 (2000) (holding that *Strickland* "squarely govern[s]" such claims). To establish such a claim, a petitioner must show that counsel's performance was deficient and that it was prejudicial to the defense, so as to render the trial unfair and the result unreliable. *Strickland*, 466 U.S. at 687. A reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 694. To demonstrate deficient performance, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.* at 688, 693-94.

To show prejudice, a petitioner must demonstrate that there is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different *Id.* at 694. A finding of no prejudice provides an adequate ground for rejecting an ineffective assistance of counsel claim, even if a deficient performance is assumed. *Id.* at 687.

In considering petitioner's claims of ineffective assistance, the Tennessee Supreme Court cited to *Strickland* for the legal principles governing such

claims. Since the controlling legal rules from Supreme Court jurisprudence were cited and applied, the state court's decision was not "contrary to" clearly established federal law as determined by the Supreme Court.

The question then becomes whether the state court unreasonably applied *Strickland* in deciding that there was no ineffective assistance because petitioner had not shown a deficiency of performance and/or prejudice. It did not.

In keeping with habeas corpus review standards, the factual determinations made by the state appellate court based on its review of the record are entitled to deference and, absent any clear and convincing evidence to the contrary, will be presumed correct. As noted earlier, this deference also extends to the post-conviction court's finding that petitioner was not credible, but that his attorney was credible.

Given these findings, as well as the state court's reasoning which supports its conclusions, the state court decision did not result from either an unreasonable factual determination in light of the evidence before it or an unreasonable application of the controlling legal principles in *Strickland.* Therefore, petitioner is not due any relief on his claim of ineffective assistance.

## V.  Conclusion

For the above reasons, this petition will be **DENIED** and the case will be **DISMISSED**.

## VI.  Certificate of Appealability

Finally, the Court must decide whether to issue a certificate of appealability (COA).  Petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right; he makes such a showing by demonstrating that reasonable jurists might question the correctness of the Court's procedural rulings or its assessment of his constitutional claims.  *See Slack v. McDaniel,* 529 U.S. 473 (2000).  The Court has found that some claims were procedurally defaulted and that some were not cognizable in these federal habeas proceedings.  The Court also found that claims which were adjudicated in state court would not support habeas corpus relief because, after an examination of the state court decisions, the record, and the relevant governing law in Supreme Court cases, those decisions did not run contrary to well established federal law, did not reflect that the state courts had unreasonably applied that law, and did not demonstrate that the state courts had disposed of those claims by unreasonably determining the facts offered to those courts.

The Court now finds that reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), and will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

A separate order will enter.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE